# In the United States Court of Federal Claims

No. 13-689C
(Originally Filed: October 29, 2013)
(Reissued: November 5, 2013)[*]

* * * * * * * * * * * * * * * * * * * *

DYNCORP INTERNATIONAL LLC,

              *Plaintiff*,

and

KELLOGG, BROWN & ROOT
SERVICES, INC.

              *Plaintiff-Intervenor*,

v.

THE UNITED STATES,

              *Defendant*,

and

PAE GOVERNMENT SERVICES, INC.

              *Defendant-Intervenor*.

Bid Protest; CICA stay override; 31 U.S.C. § 3553.

* * * * * * * * * * * * * * * * * * * *

    *Richard Paul Rector*, Washington, DC, and *Seamus Curley*, Washington, DC, argued for plaintiff. *Jason Andrew Carey*, Washington, DC, for plaintiff-intervenor.

    *Elizabeth Anne Speck*, Civil Division, Department of Justice, Washington, DC, with whom are *Stuart F. Delery*, Assistant Attorney General,

---

[*] This opinion was originally filed under seal. Publication was deferred pending the parties' review for redactions of protected material. The parties did not identify any material that needed to be redacted. This opinion is now prepared for release.

*Bryant G. Snee*, Acting Director, and *Patricia M. McCarthy*, Assistant Director, for defendant. *Robert Stephen Nichols*, Washington DC, and *Anuj Vohra*, Washington, DC, argued for defendant-intervenor.

_____

OPINION

_____

BRUGGINK, *Judge*.

This is an action challenging a Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553 (2006), override decision by the Department of State ("DOS"). Currently before the court are plaintiff's motion to supplement the administrative record, plaintiff and plaintiff-intervenor's joint motion for reconsideration of our denial of plaintiff's motion for a preliminary injunction, and the parties' cross-motions for judgment on the administrative record. The motions are fully briefed, and we heard oral argument on October 23, 2013. As we notified the parties at the conclusion of oral argument, and for the reasons more fully explained below, we deny plaintiff and plaintiff-intervenor's joint motion for reconsideration, grant in part and deny in part plaintiff's motion to supplement the administrative record, grant defendant's

and defendant-intervenor's[1] motions for judgment on the administrative record, and deny plaintiff's and plaintiff-intervenor's cross-motions.

BACKGROUND

Plaintiff, Dyncorp International LLC ("Dyncorp"), was one of the companies that bid on solicitation number SAQMMA-12-R-0130 to provide Baghdad Life Support Services ("BLiSS") to the Department of State. The services covered by the contract include, among other things, food procurement, food service, fuel, fire and first responder services, aircraft operations, security systems operation and maintenance, waste management, and sensitive equipment demilitarization. The BLiSS contract replaces at least five contracts, all performed in Iraq, and several inter-agency agreements. These contracts include:

---

[1] Defendant and defendant-intervenor objected to the motion to intervene as a plaintiff filed by Kellogg, Brown & Root ("KBR"), an unsuccessful offeror to the BLiSS procurement, on the ground that KBR's protest at the Government Accountability Office ("GAO") was not filed in time to trigger an automatic stay. See 31 U.S.C. § 3553(d) (stating that the stay is automatically triggered when a protest is filed at GAO and notice is given to the agency on or before "the date that is 10 days after the date of contact award"). KBR filed its protest and DOS was notified of KBR's protest on Monday, September 9, 2013, which was the eleventh calendar day following contract award. In Unisys Corp. v. United States, this court previously held that an "agency only has a duty to suspend performance under § 3553 if it receives notice from GAO within ten calendar days of contract award." 90 Fed. Cl. 510, 518 (2009). However, neither the current CICA stay provision nor its implementing regulations employ the term "calendar days." See 31 U.S.C. § 3553(d); 48 C.F.R. § 33.104 (2013). Rather, 31 U.S.C. § 3555(b) provides that, "in computation of any period described in this subchapter . . . (2) the last day after such act, event, or default be included, unless – (A) such last day is a Saturday, a Sunday, or a legal holiday." September 9, 2013, was therefore the tenth day for purposes of section 3553(d) and the resultant CICA stay. KBR is thus an interested party in this action.

| Agency | Incumbent | Expiration[2] | Description |
|---|---|---|---|
| United States Army | KBR | 12/31/2013 or with extension: 6/30/2014 | Food services, air support services, fire department services, badging services, and waste management |
| Defense Logistics Agency ("DLA") | Anham | 2015 | Food acquisition and logistics through Kuwait |
| DLA | Ram Dis Ticaret A.S. | 12/31/2013 or with extension: 6/30/2014 | Fuel acquisition and logistics; procurement and delivery of gasoline and diesel fuel from Turkey |
| Army Sustainment Command | URS Corporation | 12/31/2013 or with extension: 3/31/2014 | Maintenance services for biometric and security equipment |
| DOS | Olgoonik, Inc. | 11/15/2013 with option to extend: 8/13/2014 | Fuel procurement and delivery from the Government of Iraq to Basrah |

In addition to these services, the BLiSS contract will also cover certain additional tasks, such as the demilitarization of sensitive and classified equipment for disposal – currently performed by DLA.

      The purpose of the BLiSS contract is to streamline provision of these essential services by combining them under one contract as the mission in Iraq transitions from one of military action controlled by the Department of Defense to one of diplomatic activity facilitated by DOS. The BLiSS contract, with option years, is valued at $1 billion. DOS awarded the BLiSS contract

---

[2] The extensions to the KBR, Ram Dis Ticaret A.S., and URS Corporation contracts would be made pursuant to 48 C.F.R. § 52.217-8.

to PAE Government Services ("PAE") on July 2, 2013.  Administrative Record ("AR") at 4.

   Dyncorp and two other unsuccessful offerors protested the July 2 award at GAO.  A CICA stay was implemented barring PAE's performance during the pendency of the protest at GAO.  DOS overrode the stay, explaining its reasons in a Determination and Findings dated July 19, 2013.  Dyncorp filed suit here challenging the agency's override decision.  Shortly thereafter, the agency voluntarily implemented a stop-work order and took corrective action to consider the GAO protests.  Dyncorp voluntarily dismissed the protest before this court.  *See Dyncorp Int'l LLC v. United States*, No. 13-539 (Fed. Cl. Aug. 6, 2013) (motion to voluntarily dismiss).

   After reevaluating the award, on August 29, 2013, the agency once again awarded the contract to PAE.  AR 4.  On September 3, 2013, plaintiff filed a protest at GAO challenging DOS's second decision to award the contract to PAE, again triggering an automatic CICA stay of performance.  At that time it was anticipated that plaintiff's protest at the GAO would be resolved by December 9, 2013.[3]

   On September 9, 2013, DOS once more overrode the CICA stay based on a new Determination and Findings ("D&F").  AR 1-15.  The D&F sets out the agency's justification for its override decision pursuant to 31 U.S.C. § 3553(d)(3)(C), which provides that the agency may override the automatic stay "upon a written finding that – (I) performance of the contract is in the best interests of the United States; or (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest."  The agency explained in the D&F that "it is still in the best interests of the Government to proceed with performance . . . . [g]iven that continuity of services is critical to [] DOS mission success and the health and safety of personnel and the alternative of executing multiple bridge contracts are [sic] far more expensive

---

[3] A lapse in appropriations caused GAO to shut down for roughly two weeks in October.  Consequently, there is now some uncertainty about whether GAO will issue a decision by that date.  If the sixteen days of shut down are added to the December 9 date, the decision would be issued before the end of the year.

and less efficient." AR 13. Once the stay was lifted, PAE was permitted to resume transition activities.

In its complaint, plaintiff protests DOS's decision to override the stay. We denied plaintiff's motion for a preliminary injunction on September 27, 2013. In its current motion for summary judgment, it seeks a declaration that the D&F was arbitrary and capricious as well as a permanent injunction to halt PAE's performance while GAO considers plaintiff's protest.

## DISCUSSION

We have jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b) (2006), to review an agency decision to override a CICA stay. *Ramcor Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289-90 (Fed. Cir. 1999). When evaluating cross-motions for judgment on the administrative record pursuant to the Rules of the Court of Federal Claims ("RCFC") rule 52.1(c), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Pmtech, Inc. v. United States*, 95 Fed. Cl. 330, 340 (2010) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)).

The test[4] for evaluating the merits of an agency's override decision is whether the agency's determination was arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706 (2012); 28 U.S.C. §1491(b)(4) (2006); *see also Pmtech*, 95 Fed. Cl. at 341-44; *Planetspace, Inc. v. United States*, 86 Fed. Cl. 566, 567 (2009) (reviewing an agency override decision by applying

---

[4] Plaintiff urges us to apply the factors adopted in *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 711 (2006), to assess the merits of the agency's decision. In particular, plaintiff urges us to apply an inquiry into whether the D&F demonstrates that "significant adverse consequences will necessarily occur if the stay is not overridden." *Id.* We decline to apply that test. We believe it overstates what is required by the arbitrary and capricious standard particularly in the context of a "best interest" justification. We note that the agency in *Reilly's* relied on an "urgent and compelling" rationale. As to the other factors, we believe that their application here would not lead to a different result. *See Dyncorp Int'l LLC v. United States*, No. 13-689 (Fed. Cl. Sept. 27, 2013) (order).

Administrative Procedures Act standards). An override decision would be arbitrary or capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Our task "is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quotation and citation omitted).

I.   Content of the Administrative Record

Our review is typically confined to the content of the administrative record furnished by the agency to document its decision. The Record filed here consists of the September 9, 2013 D&F, the BLiSS Request for Proposals, the July 2, 2013 award document, two of Dyncorp's filings at GAO, and KBR's September 9, 2013 filing initiating its protest at GAO. Plaintiff has sought to supplement the Administrative Record with a number of documents: the affidavits of Michael Mayo, a Principal Program Manager at KBR, along with attachments to those affidavits; an affidavit from Alan Boege, a Task Order Contract Administrator at KBR; the July 30, 2013 Determination and Findings authored by DOS; an ordering guide from the Army Sustainment Command - First contract with URS Corporation; a press release issued by Anham, the contractor currently providing food acquisition pursuant to a contract with DLA; an amendment to the DLA contract with Ram Dis Ticaret A.S.; Dyncorp's August 30, 2013 written debriefing; and correspondence and filings from the current protest before GAO. Plaintiff argues that these documents are necessary for effective judicial review and are appropriate for inclusion in the Record because most of the documents predate the current stay override decision and were included in Dyncorp's first stay override protest, which placed the documents before the agency.

Defendant asserts that it has included everything in the Administrative Record that is necessary for effective judicial review, citing *Axiom Resource*

*Management, Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (holding that the trial court abused its discretion by adding plaintiff's documents to the administrative record without evaluating whether the record before the agency was sufficient to permit meaningful judicial review). While *Axiom* may set the standard for supplementing the administrative record, the rules of our court establish the type of "core documents" that the government was "required to identify and provide" or "make available for inspection." RCFC App'x C 21-22. These core documents include, when relevant and appropriate, pre-award or post-award debriefing, "documents relating to any stay, suspension, or termination of award or performance pending resolution of the bid protest," determination and findings prepared for the procurement, and "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement." RCFC App'x C 22(r), (s), (t), (u).

Some of the documents that plaintiff has put before us can be categorized as "core documents." The original D&F authored by DOS, the written debriefing provided to Dyncorp on August 30, 2013, and the correspondence and filings from the current protest before GAO all presumptively qualify for inclusion in the Administrative Record under appendix C of the court's rules. We include them within the Administrative Record.

The balance of the materials plaintiff seeks to introduce are neither core documents nor, given the limited nature of the question before us, necessary for effective judicial review. Much of the offered material relates either to whether the existing contracts can be extended or to the merits of the GAO protest. The latter issue is clearly not in front of us. While the former question is relevant to some extent, as we explain below, accepting the new material is not necessary because the agency concedes the thrust of plaintiff's point, and including it would be tantamount to opening the agency's D&F to de novo review.

II.   Whether the Agency Justified its Decision Using the Best Interest or Urgent and Compelling Circumstances Rationale

As referenced above, when an agency elects to override the automatic CICA stay, it must explain whether its decision was predicated on its "best interests" or for "urgent and compelling" reasons. *See* 31 U.S.C. § 3553(d)(3)(C) (2006). Although the D&F here purports to rely on a "best

interest" rationale, it is confusing in that it also incorporates language consistent with the alternative "urgent and compelling" rationale, prompting plaintiff to urge the court to hold the agency to the more stringent proof required for the latter determination.

The September 9, 2013 notice letter issued by DOS to accompany the D&F provides that the agency "determined it to be in the best interest of the Government to proceed with contract performance." AR 1. In support of its "best interests" determination, however, the agency cites to the wrong statutory authority, 31 U.S.C. § 3553(d)(3)(C)(i)(II), which assumes that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." And at paragraph seventeen of the D&F, although the agency invokes the "best interest" rationale, it goes on to state that "[t]here are urgent and compelling circumstances that significantly affect the interests of the United States that will not permit waiting for the GAO's decision on the protest." AR 6. Similarly, in the final paragraph of the D&F, the agency concludes that "authorizing contract performance by PAE . . . is in the best interests of the United States Government due to urgent and compelling circumstances that significantly affect the interests of the United States and will not permit waiting for GAO's decision on the protest." AR 15.

Defendant concedes that the D&F is confusing, but it insists that the controlling language throughout is the "best interests" justification. We agree. In the introductory paragraph, the D&F recites that ensuring that life support services continue without disruption is in the government's "best interests." AR 2. This rationale is repeated throughout the D&F as the agency explains why transition to PAE ensures the government's best interests by lessening the risk that there will be a disruption in life support services. *See* AR 3 ("Without life support services for these DOS sites, the DOS Mission and the security, health, safety and welfare of personnel in Iraq will be severely jeopardized."); AR 5 ("[T]he transition schedule . . . will not accommodate any unforeseen delays or external events that may further impact the transition schedule."); AR 6 ("The security vetting process for workers is drawn out and complicated, and filled with inherent delays."); AR 11 ("To the extent[] [that DOS] was able to negotiate a bridge contract with a vendor(s) to provide services directly to [DOS], it is not in the Government's best interest to do so [because] . . . a short term arrangement would be at much greater cost [and] . . . [t]here is no single contractor who is ideally suited to provide all services in house.").

In sum, despite confusing language sprinkled throughout the D&F, we conclude that the agency reasoned that the stay override was justified because that course of action was in the government's best interest.[5]

III.   Whether Plaintiff has Proven that the Agency's Best Interest Decision was Arbitrary and Capricious

The fundamental reason offered by the agency for its override decision is that it is in the government's best interest to proceed with transition to PAE in order to ensure that essential life support services, including food, fuel for electricity, and emergency response services continue uninterrupted. The D&F is 14 pages in length. It begins by summarizing the mission in Iraq and describing the contracts that are currently in place to enable the government to carry out that mission. The D&F catalogs the current contracts and interagency agreements by type, by contractor and agency, and by duration. The Head of Contracting Activity in DOS, Cathy J. Read, recites that she considered sole-source extensions and bridge contracts and decided that pursuing an alternative to PAE's performance was not in the government's best interest because, in transitioning to PAE, even a best-case scenario left no more than a three month cushion. If there are unexpected difficulties, and she believes that to be plausible given the location, that cushion could disappear and there might be a gap in performance.

The D&F attempts to assess the viability of contract extensions or sole-source bridge contracts against the backdrop of variables involved in the

---

[5] While the "best interests" rationale is, at it sounds, less demanding, there are ramifications at GAO from the agency's choice of that rationale. "If the head of the procuring activity responsible for a contract makes a finding" based on the best interest justification, then, in the event the protestor establishes grounds for its protest, "the Comptroller General shall make recommendations . . . without regard to any cost or disruption from terminating, recompeting, or rewarding the contract." 31 U.S.C. § 3554(b)(2).

transition to the new BLiSS contractor.[6]  The D&F assesses the feasibility of extending each of the contracts in turn.

     The life support contract being performed by KBR is set to expire on December 31, 2013.  The agency acknowledges that KBR's contract could be extended through June of 2014.  PAE needs approximately 45 to 90 days to obtain authorization to mobilize from the government of Iraq.  Then, KBR requires 90 days for demobilization which is coextensive with PAE's time for transition.  Thus, there is a 130 to 180 day window projected for PAE to acquire approval, for PAE to transition, and for KBR to demobilize.  Even with PAE beginning the process in September of 2013, KBR's contract will likely need to be extended into January, February, or March of 2014 in order to complete the transition to PAE without a lapse in services.  If the window for transition of this contract was delayed until after GAO issues its decision, then approval, transition, and demobilization is projected to be complete anywhere from April to June 2014.  Shifting the transition process for this

---

[6] The DOS Executive Director of the Bureau of Near East Affairs, Lee Lohman, asserts in a declaration attached to the D&F the following:

> The security situation in the Middle East and in Iraq at the moment is a grave and growing concern. . . . [T]he host government continue[s] to be poorly-defined and ever-changing . . . [and] regularly erects barriers or raises objections to the operations of the [United States government] support contractors within Iraq.  Managing these procedures and overcoming these barriers requires an extraordinary amount of additional energy, on the part of both Embassy officials and contractor companies, to complete actions considered routine in countries with longer-established governments, such as transportation requests, customs clearance and visas for government and contractor personnel. . . . Accordingly, the transition to the new BLiSS contractor may take longer than planned and may face additional obstacles.

AR 18.  In addition to the time required to obtain licenses, security clearances, visas, or approval from the government of Iraq, there must also be time built into the schedule for the new contractor to transition in and for the incumbent to demobilize.

contract eliminates or significantly reduces the cushion that DOS must preserve in order to "accommodate any unforeseen delays or external events that may further impact the transition schedule." AR 5.

The Army Sustainment Command – First contract with URS Corporation also ends on December 31, 2013. The agency asserts in the D&F, without explanation, that URS Corporation's contract cannot be extended beyond March of 2014. While the D&F did not provide an estimate for the time needed to accomplish PAE's transition and URS Corporation's demobilization, the D&F does anticipate that it will take PAE six months to obtain the International Traffic in Arms license that is required to maintain and support a system with radiological materials under the BLiSS contract. Assuming that PAE applied for this license in September of 2013, it could be February of 2014 before PAE secures the license. Even in a best-case scenario, there is roughly a month of cushion during which unforeseen complications could be addressed. If PAE was forced to delay application for the license until after GAO resolves the protest, then PAE would likely not have the license necessary to carry on URS Corporation's work when the contract expires on March 31, 2014.

DLA's contract with Ram Dis Ticaret A.S. for fuel ends on December 31, 2013. This contract could be extended through June 30, 2014. The D&F notes that "there is no requirement for demobilization that would impact the schedule." AR 7. DOS estimates, however, that it will take PAE 90 to 120 days to obtain licenses, diplomatic notices, and register as a commodity supplier with the government of Iraq. While PAE could accomplish this before the existing contract ends, that contract might have to be extended into January of 2014. In the event this process began after GAO issued its decision, then PAE would have all of the necessary requirements in place in April or May of 2014. That would leave at most three months, and worst case only two months, of buffer time to safeguard against a disruption in services due to unforseen circumstances.

DOS considered a partial override, i.e., having PAE take over the work which had the least room for unexpected problems, and found that this option was untenable and would add to the government's risk because it would require cooperation between contractors who have conflicting interests. AR 15. The agency also explained that it considered multiple sole-source bridge contracts, but each would involve negotiations and a 60-90 day transition in

period for obtaining visas and clearances, making these interim measures unreliable. AR 10.

The agency has taken the position that, even if PAE's transition for each of these contracts began in September of 2013, there is still a very real possibility that DOS will have to unilaterally extend some[7] of the incumbent contracts pursuant to 48 C.F.R. § 52.217-8 to ensure continuity of services. After listing all of the steps involved in maintaining the status quo, the agency concluded, "even if the extensions were granted, it is not a feasible approach and cannot ensure continuity of services." AR 5. The agency further explained that, if approval for contract extensions,

> was granted in a reasonable amount of time, even a full six month extension would not ensure adequate time for transition and would not accommodate any unforeseen delays or disruptions. Given the current volatile situation in the Middle East there is significant concern that there will be evacuations and/or delays for contractor staff transitioning.

AR 9.

The relevant question is whether plaintiff has shown that this analysis as to the government's best interest was arbitrary or capricious. Plaintiff contends that the agency failed to give sufficient attention to whether there were reasonable alternatives to the stay override, specifically through contract extensions, or sole-source bridge contracts. It suggests that contract extensions could be made pursuant to 48 C.F.R. § 52.217-8, which provides, "The Government may require continued performance of any service within the limits and at the rates specified in the contract. . . . The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months." It also argues that there is no suggestion in the D&F that the agency began the process of invoking 48 C.F.R. § 52.217-8 or that it attempted to negotiate with existing contractors to enter into sole-source contracts extending performance.

---

[7] The D&F also explores the DLA contract with Anham for food and the DOS contract with Olgoonik, Inc. for fuel and concludes that these contracts could be extended by their own terms long enough so that continued provision of these services is not a concern.

While it is correct that there is no reason to believe the agency actually began the process of triggering contract extensions, or attempted to negotiate sole-source bridge contracts, what is clear is that the agency was aware of those possibilities, seriously considered them, and rejected them with coherent and reasonable explanations. The extensions that the government could invoke by right would only take the existing contracts out until March 31 or June 30, 2014. Given the need to allow for demobilization and transition, the cushion periods effectively ranged from 0 days to 90 days. Other contract vehicles beyond that time would have involved negotiation, competition, and their attendant uncertainties.

Given the fact that all the transition activities would occur in Iraq, which the agency describes as a dangerous place and one in which it is in the government's best interest to limit personnel and the size of its "footprint" in order to minimize security concerns, AR 12, and that multiple contract vehicles would have to be extended, with the attendant need for visas, housing and licensing, it was not arbitrary or capricious to limit the risks of transition by overriding the stay. These are not illusory concerns. In light of the possibility that extending existing contracts or implementing sole-source bridge contracts would not unfold with the efficiency of a Swiss watch, the agency's decision that the best interest of the government was served by initiating immediate transition to PAE rather than pursuing what it believed was a risky alternative approach was not unreasonable. While the government may have been cautious, it was not arbitrary or capricious to insist on a stay override to ensure a buffer period during the transition schedule.

IV.     Whether We Apply the Test for Injunctive or Declaratory Relief

Plaintiff seeks both a declaration invalidating the agency's override decision and a permanent injunction halting PAE's performance during the pendency of the GAO protest. As defendant points out, the test for obtaining injunctive relief is more extensive than that for obtaining declaratory relief. Plaintiff concedes the point, but takes the position that it would be sufficient for its purposes if the court merely declared that the D&F was arbitrary and capricious. By negating the D&F, what would automatically re-emerge, according to plaintiff, is the statutory CICA stay.

Defendant disagrees, contending that, if what plaintiff really seeks is an end to PAE's current performance, this amounts to affirmative relief and is tantamount to an injunction. It cites *PGBA, LLC v. United States*, 389 F.3d

14

1219, 1228 (2004) (affirming the trial court's decision to deny plaintiff's request for declaratory relief when the nature of the relief sought was injunctive). If the government is correct, plaintiff would also have to meet the four-part test for obtaining an injunction: (1) success on the merits, (2) proof that the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) proof that the balance of hardships favors the grant of injunctive relief, and (4) that the public interest is served by a grant of injunctive relief. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Defendant contends that plaintiff clearly cannot demonstrate that it would suffer permanent injury during the pendency of the stay or that its injury would exceed the threat to the government from delay.

This is a topic on which judges of this court have disagreed. *Compare URS Fed. Servs., Ins. v. United States*, 102 Fed. Cl. 674, 675-76 (2012) (holding that declaratory relief was sufficient), *and Chapman Law Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005) (concluding that declaratory relief reinstates the statutory stay), *with Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 194-195 (2007) (applying the injunctive factors).[8]

We need not resolve the question, however. Either remedy requires plaintiff to prevail on the preliminary issue, namely, that the D&F was

---

[8] See also the discussion in James Y. Boland, *CICA Override Practice – The Case Against Injunctive Relief*, 50 Gov't Contractor, No. 1, ¶ 1 (Jan. 9, 2008) (citations omitted):

> In *PGBA*, a declaration would have been tantamount to an injunction because the plaintiff wanted the [Court of Federal Claims] to terminate the award – in other words, relief that was an inherently coercive act by the court with respect to the agency. In CICA override cases, however, declaratory relief is not tantamount to an injunction because there is no coercive action on the part of the court. A declaration invalidated the override decision, and the *statute* simply reimposes the stay that is otherwise required by law. By its nature, a declaratory judgment prevents a future override decision based on the rationale stated in the D&F that has been declared invalid.

15

arbitrary and capricious. We have concluded that the agency's decision was not.

CONCLUSION

For reasons explained above, we grant in part and deny in part plaintiff's motion to supplement the administrative record. We deny plaintiff and plaintiff-intervenor's joint motion for reconsideration of our denial of plaintiff's motion for a preliminary injunction. We deny plaintiff's and plaintiff-intervenor's motions for judgment on the administrative record. We grant defendant's and defendant-intervenor's motions for judgment on the administrative record. The clerk is directed to enter judgment accordingly and dismiss the complaint with prejudice. No costs.

s/ Eric G. Bruggink  
ERIC G. BRUGGINK  
Judge